IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2013

**STATE OF TENNESSEE v. LAM HOANG NGUYEN**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-C-1973     Steve Dozier, Judge**

---

**No. M2012-00654-CCA-R3-CD - Filed August 13, 2013**

---

A Davidson County Grand Jury convicted the Defendant-Appellant, Lam Hoang Nguyen, of sexual battery, for which he was sentenced to 18 months probation after service of 10 days in confinement.  In this appeal, Nguyen argues (1) the evidence was insufficient to sustain his conviction for sexual battery; and (2) he was denied a fair and impartial trial due to jury bias.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Thomas A. Overton, Nashville, Tennessee, for the Defendant-Appellant, Lam Hoang Nguyen.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel, Assistant Attorney General; Victor S. (Torry) Johnson, III,  District Attorney General; and Pam Anderson, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On January 17, 2010, M.N.,[1] the victim in this case, spent the evening dancing and drinking with friends, including Nguyen, at a local club in Davidson County, Tennessee.  Around 7 a.m. the next morning, the victim awoke at a friend's home with her leggings pulled down and her skirt above her waist.  She felt Nguyen penetrating her vagina and anus with his penis and hands. She also felt his hands on her buttocks, legs, and arms.  Based on these events, Nguyen was later indicted on four counts of rape.  Counts 1 and 3 were based

---

[1]  This court refers to victims of sexual violence by their initials only.

on anal penetration and Counts 2 and 4 were based on vaginal penetration. The following proof was adduced at trial.

Sometime in 2008, two years prior to the offense, the victim met Nguyen while she was a waitress at a local bar and grill. Nguyen was a weekly patron who normally sat in the victim's section. The victim and Nguyen became friends and continued to meet once or twice a week for drinks. Although the victim was not interested in a romantic relationship with Nguyen, she acknowledged that she kissed him once when he gave her a ride to work. She explained, "I felt obligated, so I did kiss him . . . He asked me to, as a thank you." The victim additionally testified that she believed Nguyen was interested in dating her because he would pay for her drinks and engage in casual flirting.

The victim testified that on January 17, 2010, Nguyen called the victim and asked if he could "tag along" with her and her friends to a local club. Nguyen offered to be the designated driver and the victim agreed. Prior to going to the club, the victim, Nguyen, and the victim's friends smoked marijuana. The victim also had one or two shots of Jagermeister. Once at the club, the victim consumed "about five [or] six" JagerBombs, which consisted of one ounce of Jagermeister and two ounces of Red Bull. She said Nguyen paid for all of her drinks.

The victim said that her next memory was awaking at about 7 a.m. the next morning at her friend's home. She was "face down in the couch" with Nguyen on top of her. She described what occurred as follows:

> I was being penetrated vaginally and anally, one of my arms was underneath me, my other arm was pinned underneath him, and I was able to roll off the couch because I was on the end. So I got up and went in the other room right after yelling, what the f--- is happening.

The victim said she felt Nguyen's penis and hands inside her vagina and anus. The victim stated that was menstruating at the time and saw her bloody tampon on the floor next to the couch.

After asking Nguyen, "[W]hat the f- - -?," the victim ran to her friend's room and asked her to make Nguyen leave. Initially, the victim did not call the police or go to the hospital. She explained that she needed to go to work and went home to take a shower. She did not go to the hospital because she did not have insurance and was not aware that hospitals performed rape kits for free. Once at work, her boss convinced her to call the police. The victim called the police and later met with Detective Joe Bardill of the Goodlettsville Police Department.

The victim told Detective Bardill that she had smoked marijuana and drank Jagermeister on previous occasions but had never experienced a "black[] out." She denied flirting with Nguyen, leading him on, or being sexually attracted to him. Finally, the victim denied engaging in consensual sex with Nguyen on the date of the offense.

On cross-examination, the victim agreed that the offense location was a small, two bedroom home where three other people were present on the morning of the offense. She further agreed that she had been to Nguyen's home twice prior to the offense and failed to include the second occasion in her statement to the police. She explained that it was "a while ago," and she did not consider it to be relevant. She also agreed that a few days prior to the offense, she went to a strip club with Nguyen to visit one of her friends and get lap dances.

The victim further agreed that she did not tell the detective how much she drank before she went to the club or that she used drugs that night. She said she was not asked those questions. She agreed that she could not explain her memory loss on the night of the offense. She acknowledged that a few days later Nguyen apologized to her but agreed that Nguyen never confessed to the offense. She said it felt like Nguyen was inside of her for "no longer than a minute."

The offense occurred in Davidson County, Tennessee at the home of Joseph and Lyndsey Peach. At trial, Mr. Peach confirmed that on the morning of the offense, his wife, Ryan Elliott, a friend named Patrick , the victim, and Nguyen were present at his home. Mr. Peach had to be at work at 5:30 a.m. and observed the victim asleep on the love-seat around 4:10 a.m. Mr. Peach testified that Nguyen was seated on a larger couch watching television. He said that Elliott was "quite intoxicated" and located in the kitchen with his wife. Mr. Peach left the house at around 4:30 a.m.

Lyndsey Peach testified, in large part, consistently with the testimony of her husband and the victim, with whom she had been friends for over two years. Mrs. Peach did not go to the club the night before the offense but recalled that the group returned between 3:45 and 4:00 a.m. She recalled that Elliott and the victim were "drunk." She said that the victim was not "as bad off" as Elliott, but she appeared tired and groggy. She said that Nguyen appeared sober and "talk[ed] perfectly fine." She confirmed that the victim fell asleep on the love-seat, while Nguyen was watching television on the long couch. She agreed that the victim later walked into her room and asked her to tell Nguyen to leave. Mrs. Peach confirmed that the victim was upset and that her clothes were "disheveled." After Nguyen left, the victim told Mrs. Peach what happened, and Mrs. Peach tried to console her. She said she later gave the couch cushions, which were bloody, to the police. On cross-examination, Mrs. Peach testified that she smoked a bowl of marijuana with Elliot, Nguyen, and the victim, when they returned from the club.

Ryan Elliott, a friend and former co-worker of the victim's, testified that he met Nguyen through the victim and considered him a "drinking buddy." He confirmed that on the night of the offense Nguyen came to the Peaches' home and drove the group to the club. Elliott testified that before they went to the club, he and the victim shared a marijuana joint, and the victim had two or three shots of Jagermeister. At the club, Elliott consumed two beers and observed Nguyen purchase one or two shots of alcohol for the victim. They left the club at 1:00 or 2:00 a.m. Elliott recalled that the victim was quiet and appeared intoxicated. The victim sat in the front passenger seat, gave Nguyen directions back to the Peaches' home, and did not flirt with Nguyen.

Elliott said Nguyen swerved on the drive home but otherwise operated the car "somewhat" successfully. Once at the Peaches' house, Elliott, Mrs. Peach, and the victim smoked more marijuana. Elliott initially sat on the couch and watched television. The victim took off her shoes, lay down on a love-seat, and closed her eyes. Nguyen sat on the love-seat, next to the victim's feet. Elliot testified that when he left the room Nguyen was lying on the love-seat, directly behind the victim. Elliott said that Nguyen was awake and the victim was asleep.

Elliott testified that the next thing he recalled was the victim entering the other room with tears in her eyes, asking Elliott "to get Nguyen the hell out." The victim looked distraught, and her clothes and hair were messed up. Elliott went into the other room and found Nguyen pulling up his pants, which were at his thighs. He repeatedly asked Nguyen "what the hell he was doing?" Nguyen pulled up his pants, buckled his belt, and did not respond. As Nguyen walked out the door, Elliott thought Nguyen said, "F- - -  you."

On cross-examination, Elliott said that he did not recall a baby or a baby crib in the room with Nguyen and the victim on the night of the offense. He said he never went to sleep that night and denied that he was intoxicated. He did not recall a person named "Patrick" being present at the house. He clarified that the victim smoked marijuana before she fell asleep on the love-seat that night. He said that there was "about an hour" between when he entered the home to when he left Nguyen and the victim alone in the living room area.

Danie Marie Bohannon, the store manager at the victim's place of employment, testified that the victim appeared "very distraught, disturbed and emotional" when she reported to work on the day of the offense. The victim told her that she had been raped, and Bohannon encouraged her to call the police. Bohannon was not present when the police arrived.

Officer Russell Freeman, a patrolman with the Hermitage Precinct of the Metropolitan Police Department, responded to the victim's call at her place of employment. He spoke with

the victim and determined that the offense occurred outside his jurisdiction. He then directed her to another police agency. On cross-examination, Officer Freeman agreed that he failed to record an exact time for when he spoke with the victim and failed to request the names of potential witnesses to the offense. He explained that this information was not obtained because no report was taken.

Detective Joe Bardill of the Goodlettsville Police Department testified that he interviewed the victim regarding the offense. He explained that he did not request a rape analysis kit because twenty-four hours had passed and the victim had bathed. Detective Bardill conducted a controlled phone call between the victim and Nguyen. The phone conversation was played for the jury and provided, in pertinent part, as follows:

Nguyen:  Hey I just want to say I'm sorry now.

Victim:  For what?

Nguyen:  For what happened . . . I was pretty messed up too. I hope we're still good, but . . . you know what . . .

Victim:  Why did you do it? I didn't even, you were drinking beer all night and you even said you weren't going to drink that much because you had to drive. Why?  Hello?

Nguyen: Yeah I'm listening.  I don't know what to tell you [the victim].  I feel really bad.  I'm sorry and I hope you forgive me. I guess the only thing I guess I can say is I'm sorry.  But on the other hand if you still hate me, then that's cool.  I understand.

Victim: No, I just want to understand like why you did that, why?  Why are you sorry?

Nguyen:  Oh, cause I didn't expect you to freak out on me.

Victim:  Why did you do it while I was asleep?

Nguyen:  Oh, I don't know.  I was just-

Victim:  How was I not supposed to freak out? I was asleep.

Nguyen:  I know, well, shit happened that night and it was my fault.  It was totally my fault and I'm very sorry and if you wish not to be my friend anymore it's cool.  I understand.  I just want you to know that I'm very sorry and I really feel bad about it.

Victim: What if I get pregnant?

Nguyen:  Well if it's my kid then I will take full responsibility for it.

Victim:  Did you cum in me?

Nguyen:  Nope. I can guarantee that . . .

Following the phone call, Detective Bardill obtained a warrant for Nguyen's arrest.  The victim's clothing was analyzed and tested negative for the presence of semen.  Detective Bardill explained that the absence of semen does not mean that a rape did not occur.

Nguyen testified that he had known the victim for two years prior to the offense.  He said that they were friends and saw each other once or twice a week to drink and smoke marijuana.  Two days before the offense, on January 15, 2010, Nguyen and the victim went to a strip club and received lap dances from the victim's friend.  After leaving the strip club, Nguyen and the victim went to a friend's house, drank Jagermeister, and smoked marijuana.  According to Nguyen, they spent the night together and "cuddled" the next morning.  The victim then invited him to join her and her friends the following Sunday night.

On Sunday, Nguyen picked up the victim and brought her to the Peaches' house.  He testified that he and the victim smoked marijuana before they left for the club.  He confirmed that he purchased two or three shots of alcohol for the victim while at the club.  He testified that when they left the club the victim was drunk, but she did not complain about any other symptoms.  The victim gave him directions back to the house.  When they returned to the Peaches' house Nguyen, the victim, and Elliott smoked marijuana and Nguyen lay down behind the victim on the couch.  Nguyen testified that he had a "vague memory of a little bit of foreplay. [The victim] moved my hand to her breast and after that we were just too tired and just pass[ed] out."  On cross-examination, Nguyen added that the victim placed her hand in his pants.  He said that his next memory was of the victim tapping him on the shoulder at 7:00 a.m.  He testified that at this point the victim "freaked out"and went into the other bedroom.  He confirmed that someone came out of the bedroom and asked him to leave.  He clarified that he said, "Gotcha" as he left.

Nguyen explained that he repeatedly apologized to the victim on the phone because he was in shock about getting kicked out of the house. He testified that he was "just trying to calm her down." He denied raping the victim and insisted that he would never do such a thing. He said that he had never previously had sex with the victim and denied that he penetrated her on the morning of the offense. Asked why he told the victim that he would take responsibility if she got pregnant, he explained that he was reassuring her despite his certainty that he did not penetrate her.

Based on the above proof, the jury convicted Nguyen of the lesser included offense of sexual battery in Count 3. The remaining counts were dismissed. Nguyen was later sentenced to a eighteen months, which was suspended after service of 10 days confinement. This appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence**. In challenging the sufficiency of the evidence, Nguyen concedes that "some form of sexual contact occurred between the victim and the defendant [however,] it is unclear as to how and by whom it was initiated." He argues that the victim's testimony "changed markedly" during cross-examination which "call[ed] into question her credibility." In response, the State contends the evidence was sufficient to support the conviction of sexual battery. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960

S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Where a defendant is convicted of a lesser-included offense, this Court must review the evidence to support the crime for which the defendant was convicted. State v. Parker, 350 S.W.3d 883, 907 (Tenn. 2011). Here, the jury convicted Nguyen of the lesser-included offense of sexual battery. T.C.A. § 40-18-110(g)(4) (2012) (codifying sexual battery as a lesser-included offense of rape). In order to sustain a conviction of sexual battery, the State must prove "unlawful sexual contact with a victim by the defendant . . . . [and] the sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent." T.C.A. § 39-13-505(a)(2) (2010). Sexual contact includes "the intentional touching of [the victim's or the defendant's] . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" T.C.A. § 39-13-501(6) (2010). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2) (2010).

Viewed in the light most favorable to the state, we conclude that the evidence is sufficient to support the sexual battery conviction. The victim testified that she could feel Nguyen penetrating her anally. She also testified that she felt Nguyen's hands on her buttocks and legs. She did not consent to any touching by Nguyen on the night of the offense. Several witnesses corroborated the victim's testimony that she was asleep at the time of the offense. They also confirmed that she was visibly upset and asked that Nguyen be removed from the house. When the victim later asked Nguyen why he did it while she was asleep, Nguyen responded, "Oh, I don't know." Rather than challenging the sufficiency of the evidence, Nguyen merely attacks the credibility of the victim. This court has repeatedly held that it is within the province of the jury to evaluate the credibility of the witnesses, to determine the weight given to their testimony, and to resolve all conflicts of evidence. See Odom, 928 S.W.2d. at 23. As evidenced by their verdict, the jury resolved any inconsistencies in the evidence in favor of the victim, as was their prerogative. Accordingly, we conclude that the evidence is sufficient to sustain Nguyen's conviction for sexual battery. He is not entitled to relief on this issue.

**II. Fair and Impartial Trial.** Nguyen contends that he was denied a fair and impartial trial, contrary to the provisions of the Sixth Amendment to the United States Constitution, and Article I, Section 9 of the Constitution of the State of Tennessee.

Specifically, he argues that Juror K.W. failed to disclose in voir dire or during trial that he was acquainted with the victim. In response, the State contends that Nguyen received a fair and impartial trial. We agree with the State.

The Sixth Amendment to the Constitution of the United States of America and Article I, Section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." Moreover, the Tennessee Constitution guarantees every accused "a trial by a jury free of . . . disqualification on account of some bias or impartiality toward one side or the other of the litigation." State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting Toombs v. State, 197 Tenn. 229, 270 S.W.2d 649-50 (Tenn. 1954)). "Since full knowledge of facts which might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges, jurors are obligated to make 'full and truthful answers . . . neither falsely stating any fact nor concealing any material matter.'" Akins, 867 S.W.2d at 355 (quoting 47 AM.JUR.2D Jury § 208 (1969)).

The common law rules governing challenges to juror qualifications typically fall into two categories: propter defectum or propter affectum. Propter defectum, meaning "on account of defect," encompasses objections based on general disqualifications, such as alienage, family relationship, or statutory mandate. Id. Such objections must be made before the return of a jury verdict. Id. Proper affectum, on the other hand, means "on account of prejudice," and encompasses objections based upon the existence of bias, prejudice, or partiality towards one party in the litigation actually shown to exist or presumed to exist from circumstances. Id. These objections may made after the return of the jury verdict. Id. This court has described "[b]ias in a juror [as] a leaning of the mind, propensity or prepossession towards an object or view, not leaving the mind indifferent; a bent; for inclination." Id. at 354 (citation omitted). Thus, when a juror conceals or misrepresents information tending to indicate a lack of impartiality, a challenge may properly be made in motion for a new trial. Id. at 355.

When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises. Id. (citing Durham v. State, 182 Tenn. 577, 188 S.W.2d. 555, 559 (Tenn. 1945)). The presumption of bias, however, may be dispelled by an absence of actual favor or partiality by the juror. See State v. Taylor, 669, S.W.2d 694, 700 (Tenn. Crim. App. 1983), perm. app. denied, (Tenn 1984). The defendant bears the burden of proving a prima facie case of bias or partiality. Akins, 867 S.W.2d at 355 (citing Taylor, 669 S.W.2d at 700). Finally, "Tennessee courts have routinely refused relief in post-verdict propter affectum challenges in cases where there was a casual relationship not disclosed during voir dire or the record failed to reveal an inherently prejudicial relationship or a false answer." State v. Joseph Angel Silva, III, No. M2003-03063-CCA-R3-CD, 2005 WL 1252621 (Tenn. Crim. App., May 25, 2005), perm.

app. denied, (Tenn. Oct. 17, 2005) (internal citations omitted); State v. Sammy D. Childers, No. W2002-00006-CCA-R3-CD, 2003 WL 214444 (Tenn. Crim. App., at Jackson, Jan. 30, 2003), perm. app. denied, (Tenn., May 27, 2003).

During the August 22, 2011 voir dire, twelve potential jurors, including Juror K. W., were seated and questioned in this case. After the court introduced Nguyen, defense counsel, and the assistant district attorney, it asked the potential jurors if they knew any of the parties. The record reflects that none of the jurors responded. The court proceeded to explain the charges, read a list of witnesses, including the name of the victim, and asked the potential jurors if any of those names were familiar to them. The record does not reflect a response from the jury panel.

After Nguyen's sentencing hearing, the victim advised a victim-witness coordinator that she recognized one of the jurors. The victim-witness coordinator then notified the assistant district attorney general of the same. In an October 5, 2011 letter, the assistant district attorney advised the trial court and defense counsel of the following:

> [The victim] informed [the coordinator] that she recognized one of the jurors. She knew his first name to be "Kevin" but did not know his last name. She said that they worked together about three years ago at [a jewelry store] for about six months. [The coordinator] asked [the victim] if they had ever been out socializing or drinking together. [The victim] stated that they had. She said that he had come to [the local bar and grill] when she worked there and sat in her section so she could wait on him. She said that she [did not] recognize him until she got on the stand to testify.

The assistant district attorney further advised defense counsel of the full identity of the juror based on her juror seating chart.

Hearings on Nguyen's motion for new trial were conducted on February 10 and 17, 2012. At the first hearing, the juror in question testified and agreed that during voir dire he denied knowing either of the parties. Asked if he concluded that he knew the victim during the trial, the juror replied,

> That is not correct. I looked at [the victim], and I said to myself, she looks familiar. But I wasn't sure because I didn't know this person's last name. And this person looks totally different from five years ago when I knew her.

The juror met the victim, similarly to Nguyen, at a local bar and grill, but he denied a relationship with the victim outside of patronizing the bar. The juror also confirmed that he

worked at the same jewelry store with the victim for six months. Asked by the court did he realize during jury service that the victim was the same person, the juror replied, "No, sir." He did not realize the victim was his former co-worker and waitress until after the trial when he was notified by defense counsel.

On cross-examination, the juror agreed that the victim's familiarity did not affect his ability to be fair and impartial. He agreed that his contact with the victim was limited to work and the local bar and grill and denied any contact with her after the trial.

No additional proof was offered at the second hearing at which both parties argued their respective position to the trial court. In denying relief on this issue, the trial court stated, in pertinent part, the following:

> There is no evidence of any extraneous prejudicial information being improperly brought to the jury's attention nor was there any outside influence that was improperly brought to bear upon this juror. The juror was clear in his statements that he was not aware that this victim witness was a person that he knew, therefore there was no bias or partiality against the defendant.

The record supports the determination of the trial court. During voir dire, the trial court read the names of the parties and potential witnesses in the case. It asked if the potential jurors knew any of the listed names. Although Juror K.W. did not respond, he explained that he did not know the victim's last name and did not recognize her because she had changed her appearance. Juror K.W. further testified that he had not seen the victim for the past five years. He did not have a relationship with the victim other than being a patron at her place of employment and working with her for a short period of time. The juror admitted that the victim looked familiar to him; however, he was unaware that he met her until he was notified by defense counsel. Certainly, as Nguyen argues, the acquaintance should have been disclosed. However, on this record, we cannot conclude that the failure to do so violated his right to a fair and impartial jury. Because Nguyen has failed to show any bias or partiality on the part of the challenged juror, he is not entitled to relief.

## CONCLUSION

Upon our review, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-11-